**Noah Horst**, OSB No. 076089
Email: noah@lmhlegal.com
**Ethan Levi**, OSB No. 994255
Email: ethan@lmhlegal.com
**Norah Van Dusen**, OSB No. 180114
Email: norah@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

**Attorneys for Defendant**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No.  3:25-cr-00306-AB |
| Plaintiff, | |
| vs. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **JOSEPH DAVID EMERSON**, | |
| Defendant. | |

In this memorandum, Mr. Emerson respectfully requests that this Court impose a sentence of credit for time served and probation.

Mr. Emerson was arrested on October 22, 2023. On September 5, 2025, he pled guilty to the single charge in the information: Interfering with Flight Crew Members. He will appear for sentencing on November 17, 2025.

At sentencing, several witnesses have indicated they wish to speak on Mr. Emerson's behalf: Frank Pinney, Carmen Loeffler, Aaron Levy, Lyle Prouse, Gwen Weil, Michael Tacconi,

DEFENDANT'S SENTENCING MEMORANDUM - 1
(Case 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

and Sarah Stretch. Two witnesses, Lyle Prouse and Gwen Weil need this Court's leave to testify remotely. We may ask this Court's leave to allow a few other witnesses to offer words during the hearing.

1. **Stipulated Sentencing Guidelines Calculation and Government and Probation Office Recommendations**

    a. **Allowable Sentences for Interference With Flight Crew Members**

This crime is a Class C felony. 18 USC 3559(a)(3). The maximum possible sentence is 20 years in prison. 49 USC 46504. The maximum fine is $250,000. 18 USC 3571(b)(3). Probation is not statutorily prohibited because Interfering with Flight Crew Members is a Class C felony. 18 USC 3561(a).

    b. **Plea Agreement – Crime Seriousness**

The parties agree:

Mr. Emerson's base offense level . . . . . . . . . . . . . . . . . . . . . . .18

Mr. Emerson has accepted responsibility (-3) . . . . . . . . . . . . . .15

Zero-point offender or "other" variance (-2) . . . . . . . . . . . . . . .13

**Final Crime Seriousness Calculation**           **= 13**

    c. **Plea Agreement – Criminal History**

The parties also agree that Mr. Emerson has no prior conviction except state convictions for the same conduct that comprises the instant offense; therefore, the state convictions are not counted as "prior sentences.". *USSG* 4A1.2(a)(1). As such, Mr. Emerson's criminal history is an **I**.

DEFENDANT'S SENTENCING MEMORANDUM - 2
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

### d. **Plea Agreement – Resulting Calculation**

The parties agree that Mr. Emerson starts out as a **13-I** on the sentencing guidelines facing a guidelines sentence of 12-18 months in prison.

### e. **Government's Recommendation**

The Government has agreed to ask this Court to sentence Mr. Emerson to no more than the low end of this range or 12 months in prison.

### f. **Probation Department Recommendation**

In his Presentence Report, Mr. Hanington recommended a sentence of time served with three years of supervised release and six months of home detention. *PSR* ¶. 2.

## 2. **Mr. Emerson's Sentencing Recommendation and Argument**

Mr. Emerson is in the unusual posture of being sentenced for a single federal crime after having been convicted and sentenced for 84 state charges for the same conduct. Mr. Emerson respectfully requests a commensurate sentence, namely that this Court impose probation rather than the government's requested 12-month prison sentence or the 6-month period of home detention suggested by the presentence report. In this memorandum, counsel sets forth several grounds to impose departures or variances from the guidelines to achieve that goal. A sentence of probation is sufficient and not greater than necessary because it will be functionally identically to a sentence requiring home detention. Mr. Emerson's daily life is now filled with the following obligations: 1) work, 2) family, 3) school, 4) recovery, 5) community service, and 6) counseling; these are the same activities Mr. Emerson would be allowed to continue during a period of home detention. Besides imposing more administrative costs and requirements, home detention will offer no other benefits to society or Mr. Emerson than a sentence of probation.

DEFENDANT'S SENTENCING MEMORANDUM - 3
(Case No. 3:25-cr-00306-AB)

**Levi Merrithew Horst PC**
610 SW Alder St. Suite 415
Portland, OR 97205
T: 971.229.1241 | F: 971.544.7092

a. **Facts of the Incident**

Mr. Emerson was charged in both the Multnomah County Circuit Court and in the United States District Court for the same conduct that occurred on October 22, 2023, while traveling as a passenger in the cockpit jump seat on Horizon Airlines flight #2059. The following facts are derived from the discovery unless noted otherwise. Approximately 48 hours before boarding flight #2059, he ate psilocybin mushrooms during a remembrance gathering for his best friend, best man, and fellow airline pilot, who died of an untreated heart problem. Mr. Emerson had never taken a hallucinogen before and when he boarded the airplane he had not slept in days. He had also avoided formal mental health treatment even though he was struggling to process his best friend's death. It is common knowledge among pilots that seeking medical or mental health treatment can jeopardize their medical certificates, rendering them unable to fly.[1] When he ate the mushrooms, Mr. Emerson was not scheduled to pilot a commercial aircraft for at least six days and believed the effects of the psilocybin would wear off within 8 hours after he ingested it. He was wrong. His reaction to the psilocybin was unusual and unexpected. Rather than gradually "coming down" from the effects of the psilocybin in a matter of hours, as is common, Mr. Emerson became completely detached from reality for several days. Unbeknownst to Mr. Emerson, he was suffering from a rare but diagnostically recognized condition: Hallucinogen Persisting Perception Disorder ("HPPD"). **(Exhibit A, CS,)**. The hallmark of HPPD is the reexperiencing, when the individual is sober, of perceptual disturbances associated with the hallucinogen. In Mr. Emerson's case, HPPD resulted in a feeling of "derealization," described in the DSM-5 as "characterized by a feeling of unreality or detachment from, or unfamiliarity with the world…the individual may feel as though he or she were in a dream, fog, or bubble…" (DSM-5-TR, p. 344). Although derealization is not a symptom of HPPD explicitly recognized by the DSM-5, research into HPPD suggests a strong connection

---

[1] https://www.nytimes.com/2025/03/18/magazine/airline-pilot-mental-health.html

DEFENDANT'S SENTENCING MEMORANDUM - 4
(Case No. 3:25-cr-00306-AB)

between derealization symptoms and HPPD: numerous studies have found derealization among people having extended negative responses following hallucinogen use. (Exhibit A, CS, P. 15). Mr. Emerson was unaware of the risk of derealization when he used psilocybin; he believed he would experience "normal" symptoms of psilocybin use for the 4-6 hour duration it was in his body. Instead, his symptoms far outlasted the normal course. He felt trapped in a nightmare. He had an ominous and foreboding sense that his family was in danger and that he would not see them again. He desperately wanted to get home to but felt that he would never get home unless he "woke up."

When he boarded flight #2059, though the psilocybin metabolites had long passed through his system, he had become derealized, spending the previous 48 hours believing his family was in danger and that he would never see them again. **(Exhibit B, CS).** He believed he was either trapped in a dream or already dead. He got on the airplane because – though he believed the airplane was not real – it was a step towards waking up from his nightmare and seeing his family. The aircraft was full, and though Mr. Emerson would normally sit in the cabin with the rest of the passengers, the only seat available was the tiny jump seat that folded down between and behind the two pilots. On the flight home he became increasingly suspicious that the airplane would never make it home and that he would endlessly fly, never reaching his destination. To Mr. Emerson, the pilots were not acting normally. When a preceding aircraft reported turbulence, the pilots did not listen, so he reminded them. Everything the pilots did seemed to Mr. Emerson to be lackadaisical and not pilot-like – further proof that he was in a dream. He tested reality constantly. He texted his friends "I'm freaking out in the JS [jump seat]." When the voice to text interpretation robotically broadcast to his ear directed him to, "Just do your breathing exercises," Mr. Emerson was convinced he *had* to wake up now. He took out his earbud and threw it across the cockpit telling the crew, "I'm not okay." They asked, "you're okay?" Mr. Emerson responded, "I'm not okay." The crewmember asked, "what's wrong." Mr. Emerson said, "I want to be home." The crewmember asked, "you

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

want to be home?" Mr. Emerson then pulled the fire extinguisher/fuel cut off levers for both engines. **(Exhibit C, CS).** The crew intervened and quickly restowed the handles so that the engines continued running. The crew intervention and their physical touch shocked Mr. Emerson and he immediately calmed. Two minutes later, he tried to open the door from the cockpit to leave but it was locked. He asked the crew to unlock the door so he could leave and at his request, the crew remotely unlatched the door and he walked out of the cockpit. **(Exhibit D, CS).** He walked back into the cabin full of people who seemed too calm to him given what he had just done in the cockpit. Once again, Mr. Emerson was convinced he was in dream – the passengers could not be real. He walked to the back of the cabin, saw a carafe of hot coffee in the galley and in an effort to awaken, he put his hand inside of it. He then sat down beside the flight attendants. They were very nice to him. He told the flight attendants he could not distinguish what was real and what was not real and asked them to tuff-cuff him. He then reached out for the emergency exit, another action he thought would certainly lead to him waking up. A flight attendant saw him reaching, intervened, and pulled his hand back. The feeling of that human touch once again calmed and redirected him. He sat quietly the rest of the flight while the flight attendants engaged him in conversation and talked with him about his family. When the airplane finally landed safely at PDX, the police entered the aircraft and arrested him. Body cam footage documents Mr. Emerson's unusual mental state when the police first encountered him. **(Exhibit E, CS)**

Upon landing, police walked him off the airplane and questioned him in a police car. Although he was polite and cooperative, to the police standing nearby, Mr. Emerson acted and sounded strange, his affect was confused and incongruent to the gravity of the situation. He told police that "mentally, I am in crisis." **(Exhibit F, CS)** He insisted that it "seemed like the pilots weren't paying attention." **(Exhibit G, CS)** He still did not believe he was in reality saying, "I appreciate the kindness [police were showing to him]; I don't understand why everyone is being so kind." **(Exhibit H, CS)** When officer Landry told Mr. Emerson, "No offense, but you look a

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

little pale." Mr. Emerson responded questioning, "I don't understand, why would that be offensive, that's a weird thing . . . that's why it feels weird, like why would you say 'no offense?'" **(Exhibit I, CS)**

Later, Police took him to a Port of Portland holding cell where despite the cold light, the steel walls and the camera, he continued to believe he was operating in a dream. Inside that cell Mr. Emerson took additional measures to "wake up" among them, hitting himself and banging his head on the walls of the cell. **(Exhibit J, CS)**. He took these measures desperate to wake up out of what he believed to be a dream. Despite his actions in the holding cell, Mr. Emerson was always polite and cooperative with the police officers who encountered him. Mr. Emerson even signed a form authorizing the police to draw his blood and cooperated with a blood draw.

The pilots recounted to police that as soon as they intervened in Mr. Emerson's attempts to shut off the engines, Mr. Emerson calmed and deescalated. **(Exhibit K, CS).** One pilot described Mr. Emerson going from zero to one hundred then back in seconds. **(Exhibit L, CS).**

Once calmed, Mr. Emerson was completely cooperative with the crew including the flight attendants in the cabin of the aircraft. **(Exhibit M, CS)**.

Multnomah County initially charged Mr. Emerson by information with 83 counts of Attempted Murder – one count for each passenger on the airplane and one count of Endangering an Aircraft in the First Degree. Following his arrest. Mr. Emerson did not contest his pretrial detention and remained in custody. Less than a month later, on November 13, Mr. Emerson met with both state and federal officials in a conference room at the Multnomah County District Attorney's Office. Mr. Emerson fully debriefed with law enforcement, answering every question about his life and what happened on the flight deck. He also provided his phone password to the federal officials and gave permission to search for certain terms obviating the need for a search warrant.

**Levi Merrithew Horst PC**
610 SW Alder St. Suite 415
Portland, OR 97205
T: 971.229.1241 | F: 971.544.7092

On November 17, 2023, and again on November 21, 2023, Mr. Emerson testified at the state grand jury proceeding and answered every question asked of him without objection.

Mr. Emerson was released on December 7, 2023, on negotiated conditions after the grand jury declined to indict him on the attempted murder charges.

Just a few days into the 46 days Mr. Emerson spent in custody, he returned to reality. His transformation was obvious to counsel. He was astounded that he could have possibly acted as he did and recounted that what he had done was "unfathomable." Mr. Emerson began processing all that had happened to him. He began journaling in jail and realized that he was an alcoholic and had been for years. He recognized he never would have taken mushrooms had he not been drinking alcohol. He resolved to live a sober life and has kept that promise for the past two years. In July of 2024, Mr. Emerson had a follow-up evaluation with Dr. Millkey and another with Dr. Vendantham each of whom found that Mr. Emerson had not had any relapse of his HPPD since the events that took place on Horizon 2059. **(Exhibit N, CS)**.

After his release and return to California, Mr. Emerson wholeheartedly joined the treatment community. **(Exhibit O, CS)** He fully engaged with mental health practitioners. He began taking classes in addiction counseling at his local college. He refocused on his family and his role as a caregiving father. Mr. Emerson used his notoriety and infamy to bring attention to the problem of health care avoidance that is rampant in the aviation profession. To this end, he and his wife Sarah Stretch started a non-profit, Clear Skies Ahead.[2] Despite the restrictions on his ability to travel by air, he obtained permission from state and federal pretrial officers to crisscross the country, speaking to aviation professionals about healthcare avoidance and generating a robust national conversation in the public sphere and in the aviation community. Mr. Emerson's willingness to

---

[2] *See* https://www.clearskiesaheadnonprofit.org.

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

speak up and advocate for reforms has resulted in congressional action and long-overdue policy changes at the FAA.[3]

The consequences of taking psilocybin have been professionally and personally devastating. At the time of the incident, Mr. Emerson worked as a captain and base safety officer at Alaska Airlines. He had a spotless and impeccable reputation. **(Exhibit P, CS)**. Following his arrest, he lost his job. The FAA revoked all his flight and medical certifications. His brokerage bank refused to continue working with him and he had to liquidate his retirement accounts. When he was in custody, media outlets around the world published his photo and various accounts of the incident. Mr. Emerson searched long and hard for work and had many rejections because of this case and his conduct. For a time, he worked cleaning swimming pools. He now has a job as a pressure washer working in the early morning hours. His family has struggled mightily because of the stress and notoriety of this case. Despite these challenges, Mr. Emerson has been a force for good. He has used his story to change the national conversation about health care avoidance in the pilot community. He has used his story to warn others of the dangers of hallucinogen use.

**b. Successive Prosecutions**

In spite of the Petite Policy, the Government refused to dismiss this case even though Mr. Emerson already fully resolved his state case. The Petite Policy limits discretion to charge and punish people except to vindicate substantial federal interests. *See* USDOJ Criminal Justice Manual, 9.2.031. Except for being a high-profile case occurring in the national airspace system, no other federal interest has gone unvindicated. The Federal Aviation Administration has revoked Mr. Emerson's pilot and medical certificates. Alaska Airlines fired Mr. Emerson, ending his career as a pilot. Mr. Emerson himself vindicated federal interests; he completed substance abuse

---

[3] See Mental Health in Aviation Act of 2025. https://www.congress.gov/bill/119th-congress/house-bill/2591/text

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

treatment, maintained his sobriety for two years, abided completely with pretrial supervision, told the world about his experience, and repaid all the restitution he owed.

On the morning of Friday, September 5, 2025, Mr. Emerson appeared in federal court where he was arraigned and pled guilty to the single count in his federal information: Interference with Flight Crew Members, a felony. Later that afternoon, Mr. Emerson walked to state court and pled "no contest" to each of the 84 counts in the indictment against him – 83 counts of Recklessly Endangering another Person for each person on the aircraft, and one count of Endangering an Aircraft in the First Degree, a felony.[4] The government insisted on the pleas occurring in this order for Petite Policy concerns. Mr. Emerson obliged and agreed to this arrangement. In state court, Mr. Emerson pled and was sentenced on the same day. Mr. Emerson listened to the State's narrative of the case, and the statements of two victims, Alison Snyder who spoke remotely at the sentencing, and another victim named Christine who wrote a letter that DDA Pickard read in court. Mr. Emerson then took full responsibility for his conduct, addressed each victim respectfully, authentically apologized to them and to the flight crew (whom he thanked) and explained to the court how he had addressed the issues that led to the incident. **(Exhibit Q, CS).**

After a brief back and forth with Mr. Emerson, where she inquired about Mr. Emerson's non-profit, Clear Skies Ahead, Judge Albrecht followed the agreed upon plea offer and sentenced Mr. Emerson to credit for time-served, imposed nearly $60,000 of restitution, 664 hours of community service (8 hours for each victim), and five years of formal probation. For the period of probation, Mr. Emerson may not be within 25 feet of an operable airplane. He is barred from using

---

[4] Mr. Emerson pled "no contest" in state court but in his plea colloquy he accepted complete responsibility for his conduct. He pled "no contest" because under state law, the prosecution had to prove that Mr. Emerson acted with a particular mental state. Because he experienced a psychotic episode at the time of the incident, believing he was in a dream and trying to wake up, he did not act "knowingly" or "recklessly". A "no contest" plea allowed Mr. Emerson to take responsibility for his actions authentically. In contrast, Interference with Flight Crew Members is a crime of general intent. The government need not plead any mental state and no expert evidence of Mr. Emerson's mental state would have been allowed at trial under current Ninth Circuit case law. For that reason, Mr. Emerson pled guilty to that crime.

DEFENDANT'S SENTENCING MEMORANDUM - 10
(Case No. 3:25-cr-00306-AB)

controlled substances, he must work or attend school, and he must abide by all the pretrial release conditions set forth in this federal case.

A redundant federal prosecution of Mr. Emerson is discouraged by the Petite Policy unless special circumstances exist. They are set forth in Section 9.2.031 of the United States Department of Justice, Criminal Justice Manual. The purpose of the Petite Policy is:

> [T]o vindicate substantial federal interests through appropriate federal prosecutions, to protect persons charged with criminal conduct from the burdens associated with multiple prosecutions and punishments for substantially the same act(s) or transaction(s), to promote efficient utilization of Department resources, and to promote coordination and cooperation between federal and state prosecutors.

USDOJ, Criminal Justice Manual, Section 9.2.031(1).

The DOJ policy manual only allows a federal prosecution to continue despite a state prosecution for the same conduct if: 1) the alleged violation involves a compelling federal interest, 2) the prior prosecution left that compelling federal interest demonstrably unvindicated, and 3) the government believes that the defendant's conduct constitutes a federal offense. There is no federal interest left unvindicated by the state prosecution. Pursuant to the policy, an unvindicated federal interest is when: 1) a [state] conviction was not achieved for various reasons, 2) the prior sentence was manifestly inadequate in light of the federal interest involved, or 3) the alleged violation involves a compelling federal interest, the alleged violation involves egregious conduct, and the result in the prior prosecution was manifestly inadequate. USDOJ, Criminal Justice Manual, Section 9.2.031(4).

A state conviction was achieved here. Mr. Emerson's sentence was not manifestly inadequate. He first faced 83 attempted murder charges and was eventually sentenced for 83 counts of recklessly endangering another person and one count of endangering aircraft in the first degree. The sentence was thoughtfully negotiated with the Multnomah County District Attorney who communicated with the 83 victims, met with Mr. Emerson several times, witnessed his testimony at grand jury, and saw the progress he made while on release. Mr. Emerson was also adequately

DEFENDANT'S SENTENCING MEMORANDUM - 11
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

punished. He was arrested immediately upon landing on October 22, 2023, jailed for 46 days, the first week or so of which he spent on suicide watch. Shortly after, Mr. Emerson's pilot's licenses and medical certificates were emergently revoked by the FAA. In mid-November, Alaska Airlines fired him from his job. Mr. Emerson is surely on the "no-fly list" but the TSA will neither confirm nor deny that. Furthermore, this incident will be on his permanent record through the FAAs Pilot Records Improvement Act (PRIA) and the Pilot Records Database (PRD). The state also insisted that Mr. Emerson plead to every single count (84) in the indictment and that he agree to the maximum length of formal probation (5 years), the same maximum as in federal court. As a part of his plea, Mr. Emerson agreed to perform a massive amount of community service (664 hours) and to repay nearly $60,000 in restitution – the identical amount the government may ask Mr. Emerson to repay in federal court. Further, as a part of his state probation Mr. Emerson is barred from being within 25 feet of any operable aircraft.

The state prosecution was robust, it fully accounted for Mr. Emerson's conduct, resulted in substantial punishment and therefore adequately vindicated the federal government's interests. By its own Petite Policy, the government should never have proceeded with its separate prosecution. This Court should therefore deem the state sentence sufficient and not sentence Mr. Emerson to any additional custody time or more restrictive probation conditions than those imposed by the state court. Mr. Emerson understands that the Petite Policy does not confer upon him any substantive rights. Instead, he asks that this Court consider the government's failure to apply the Petite Policy despite the adequate and robust state prosecution, as reason to grant a downward departure or variance from guideline calculation to probation.

###    c.    Sentencing Procedure

Mr. Emerson's advisory guidelines sentence is between 12 and 18 months in prison. The government has agreed to request 12 months' imprisonment, and the plea agreement allows Mr. Emerson to ask for a probationary sentence. Probation, on the other hand, recommended a sentence

of six months of home detention. Given the facts and circumstance of this case, Mr. Emerson's personal characteristics, and his extraordinary efforts to make amends and deter others from similar conduct, he respectfully requests this court impose a probationary sentence with time served.

The sentencing guidelines have changed. After November 1, 2025, courts are no longer mandated to consider downward departures. *Amendments to USSG*, April 30, 2025. Mr. Emerson pled guilty on September 5, 2025, before the recent amendments. Nevertheless, it is instructive to consider all steps under the old guidelines because courts still have authority to consider all information "without limitation" in determining a sentence. 18 USC 3661. Mr. Emerson qualifies for departures that this Court may consider under the process outlined in the 2025 amendments to the United States Sentencing Guidelines.

Under the old sentencing procedure, the first step was to calculate defendant's advisory sentencing range. Here, the parties have agreed on that range (13-I or 12-18 months prison). Though this calculation is required, it is not binding but a starting point in the sentencing analysis; the court must then consider all the facts surrounding the offense, Mr. Emerson's personal characteristics, and the purposes of sentencing laid out in 18 USC 3553(a). *United States v. Booker*, 541, US 220, 259 (2005).

The second step – a step omitted from the 2025 amendments to the United States Sentencing Guidelines – is for the court to consider policy statements and guideline commentary relating to departures and specific personal characteristics that might warrant consideration in imposing the sentence. The third step requires the court to consider the factors listed in 18 USC 3553(a). This final step has three components: First, to consider "the nature and circumstances of the offense and the history and characteristics of the defendant". 18 USC 3553(a)(1). Second, the court must consider the need for the sentence imposed: a) to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; b) to afford adequate

DEFENDANT'S SENTENCING MEMORANDUM - 13
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

deterrence to criminal conduct; c) to protect the public from further crimes of the defendant; and d) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. 18 USC 3553(a)(2). Third, the court must "impose a sentence sufficient, but not greater than necessary to comply with the purposes in 18 USC 3553(a)(2).

If, in considering all the factors listed in 18 USC 3553(a), a court finds the guidelines sentence to be either too harsh or too lenient the court may use variances or departures to impose a sentence outside the sentencing guidelines calculation.

### d. 18 USC 3553(a) Factors:

### The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

### i.    The Nature and Circumstances of the Offense

Although this offense was very serious - Mr. Emerson himself has called his conduct "unfathomable" - these consequences did not materialize because of the flight crew's heroic and timely response and because Mr. Emerson ceased his conduct when redirected and complied with the flight crew's response, sitting calmly afterwards. The flight crew described Mr. Emerson as acting normally until "he went from zero to one-hundred and back," in just a few seconds. After the crew intervened and Mr. Emerson calmed, Mr. Emerson decided on his own that he needed to leave the cockpit. Without being asked to exit, he left of his own accord after the crew unlocked the door.

Mr. Emerson's act was not willful, nor did he intend to hurt or kill anyone; instead, he believed he was in a dream and desperately wanted to wake up. Mr. Emerson's altered state of mind, resulting from the combination of a hallucinogen-induced mental disorder and severe lack of sleep, rendered him unable to accurately perceive reality. Mr. Emerson's confusion about reality was clear to the crew members in the aircraft, the police who interacted with Mr. Emerson, medical

DEFENDANT'S SENTENCING MEMORANDUM - 14
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

personnel who responded to the scene and his lawyers when they first met him in the jail. Law enforcement noted that Mr. Emerson was pale, that he seemed dehydrated, that he spoke about not knowing what was real or what was a dream.

### ii.    Mr. Emerson's History and Characteristics.

Except for a few seconds in the cockpit on October 22, 2023, Mr. Emerson has led a high-achieving, law-abiding life. As his many letters of support attest, Mr. Emerson earned the respect and admiration of many in his community and in the airline industry. He still has the support of a myriad of people from his life before and after this incident. As a pilot, Mr. Emerson was so safety-oriented he was selected to be a subject matter expert in "Upset Prevention and Recovery" (UPRT) – a training program designed to prevent the loss of aircraft control in flight.  As a subject matter expert in UPRT, he led the Upset Prevention and Recovery Program training for Alaska Airlines in 2019. He was so safety-oriented and professional that Alaska Airlines made him the Base Safety Officer at its San Francisco hub. Mr. Emerson's personal life has also been spotless. He has no criminal record. He has been married once – to his wife, Sarah Stretch, with whom he has two children. He has a supportive extended family and in-laws. Mr. Emerson accepts complete responsibility for his actions. He pled "no contest" to every charge in his state case and pled "guilty" to the single count in the federal case. Since this incident, Mr. Emerson achieved sobriety, has dedicated his life to addressing his substance use disorder, giving back to his community through community service, raising awareness about pilot mental health, advocating for changes to protect pilot health, supporting others who are struggling with substance use, and devoting himself to his family. He has to preventing this type of event from ever happening again to him or any other pilot.

### iii.    The Need For the Sentence Imposed To Reflect the Seriousness of the Offense.

Mr. Emerson's conduct was driven by an unforeseen, temporary psychosis. Mr. Emerson was suffering in silence out of fear he would lose his medical certificates if he accepted

DEFENDANT'S SENTENCING MEMORANDUM - 15
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

psychological care. Perhaps encouraged by the cultural obsession with psilocybin as a treatment for depression, and grieving the loss of a close friend, he made the decision to eat psilocybin. He had no idea he would become detached from reality and stuck in a nightmare days after the drug left his system. Though terrifying, his disorganized and dangerous conduct in the cockpit lasted for seconds and when confronted by the pilots, he stopped, he was compliant, he was cooperative, and he is mortified by what he has done.  Mr. Emerson lost the career he dreamed of having since he was a young boy, lost his income, his status, and his ability to work in an industry he loved. The state has already imposed substantial punishment, including 46 days in jail, five years of supervised probation, payment of nearly $60,000 in restitution, and community service. His family has suffered greatly. These very public punishments adequately reflect the seriousness of Mr. Emerson's offense. Taken together, Mr. Emerson's arrest, his detention, his acceptance of responsibility, his cooperation, his plea to all counts in all courts, his convictions on every single charged count, the loss of his licenses and certificates, the loss of his livelihood constitute heavy penalties and adequately reflect the seriousness of his conduct.

### iv.       The Need For Adequate Deterrence.

Mr. Emerson's public interviews about his journey from captain at a major airline to a man who lost his beloved career to psilocybin use have been broadcast throughout the world. He granted interviews to the New York Times, CBS News, Good Morning America, and gave personal lectures to pilot groups nationwide. This attention has opened eyes to the dangers of psilocybin use including little-known effects long after the drug leaves the bloodstream. Mr. Emerson's active efforts to publicly warn others about his experience – while two criminal prosecutions were pending - have surely deterred many people from taking psilocybin and have spotlighted the issue of mental health care avoidance of aviation professionals.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

In September of 2025, this incident and Mr. Emerson's efforts to change aviation policy led to the passage of the Mental Health in Aviation Act,[5] a groundbreaking piece of federal legislation aimed at forcing the FAA to overhaul its pilot mental health rules. Further, his advocacy led the Washington State legislature to propose expanded paid family and medical leave benefits to pilots whose medical certifications have been suspended due to mental or neurological conditions, effectively lowering a barrier for pilots to report and seek care for mental health issues.[6] Finally, this incident led the National Transportation Safety Board to urge the FAA to reform its mental health rules to prevent pilots from silently contending with unreported mental health issues.

Mr. Emerson self-initiated and immersed himself in recovery and making amends for his criminal behavior. Mr. Emerson is a unicorn defendant – he started a non-profit to research, understand, advocate and change the national conversation about pilot mental health to deter this kind of incident from happening again. Incarcerating Mr. Emerson would send the wrong message to society – no matter what amends one makes for their criminal behavior, no matter how much they give back to their community, no matter how hard they try to authentically understand and deter similar incidents, they will still go to prison.

### v.     The Public Does Not Need to be Further Protected from further crimes by Mr. Emerson.

The bizarre psychotic episode that occurred after Mr. Emerson first ingested psilocybin but continued long after the drug passed through his system, constituted an extreme aberration in perception and behavior for Mr. Emerson. It was completely out of character and it will never happen again. In July of 2024, Dr. Millkey verified in a follow-up evaluation that Mr. Emerson remained stable after this one-time episode of psychosis with no recurrence. Before this incident,

---

[5] https://www.cnn.com/2025/09/09/us/pilot-mental-health-bill

[6] https://www.fox13seattle.com/news/washington-mental-health-benefits-pilots

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

Mr. Emerson was stable, but he drank alcohol too frequently and was at times melancholy. He now understands he has a substance use disorder that led to his use of psilocybin, has been through treatment, and is in recovery. Mr. Emerson always lived a law-abiding life dedicated to ensuring the safety of others. Mr. Emerson is committed to never again use any non-prescribed, mind-altering substances. Since his release from custody, he has remained sober and is of sound mind. He has fully engaged in recovery and mental health care. He does not present a danger to the public – to the contrary, his actions since his arrest have benefitted the public and positively impacted his community. Accordingly, this factor should not apply to Mr. Emerson and supports a sentence of probation.

### vi.    Mr. Emerson will not benefit from vocational training or treatment in prison.

Mr. Emerson independently sought substance abuse and mental health treatment, successfully completed an inpatient substance abuse treatment program, is in school to become a substance abuse evaluator and counselor, and is indispensable to his family. As such he will not benefit from any vocational training or treatment in prison. Prison will only cause more financial, emotional, day-to-day stress on Mr. Emerson's family and remove him from his employment and his daily treatment functions. Currently, he is a present and engaged father to his young children and effectively managing his substance abuse disorder and mental treatment. He is well on his way to forging a new career.

### vii.    The Need to Avoid Unwarranted Sentencing Disparities Does Not Exist In This Case Given The Unusual Posture of this Case.

The presentence report discussed that four other defendants with similar charges and a similar guidelines range received an average of six months imprisonment. We cannot learn about these comparator cases because the Sentencing Guidelines Commission keeps the underlying data

DEFENDANT'S SENTENCING MEMORANDUM - 18
(Case No. 3:25-cr-00306-AB)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

confidential.[7] However, it is highly unlikely these cases mirror Mr. Emerson's case. Mr. Emerson's case is unusual in so many respects. Mr. Emerson was suffering a rare and temporary psychosis. Mr. Emerson was separately punished for the same conduct in state court. Mr. Emerson spent 46 days in pretrial incarceration. Mr. Emerson completely accepted responsibility for his conduct and was sentenced in state court before his federal sentencing. Mr. Emerson completely cooperated with the government, paid his restitution, completed both inpatient and outpatient substance abuse treatment, and engaged actively and consistently in recovery meetings since his release. He started a non-profit to remedy aviation professionals' health care avoidance. He raised awareness worldwide about the dangers of hallucinogen use. For these reasons and the unusual posture of this case, a sentence of time-served and probation will not amount to an unwarranted sentence disparity because his case is so unique.

### viii.    The Need to Provide Restitution to any Victims.

The need to provide restitution is a sentencing factor this Court must consider under 18 USC 3553(a)(7). Mr. Emerson has already satisfied this factor because he has already repaid the full restitution.

### ix.    A Sentence of Time-Served and Probation Will Sufficiently Punish Mr. Emerson for his Conduct.

Mr. Emerson has been punished in state court and will continue to be punished for his actions throughout his life. This punishment is more than sufficient to achieve the factors set forth in 18 USC 3553(a). No additional punishment is necessary to achieve the factors set forth in 18 USC 3553(a). Mr. Emerson was an airline captain who strove every day to ensure the safety of

---

[7] On October 14, 2025, Counsel emailed Glenn Schmitt at the USSC inquiring about the four cases cited to in the presentence reports analysis of similar cases in on page two of the presentence report. Mr. Schmitt responded that same day, "The Sentencing Commission has a long-standing agreement with the Administrative Office of the U.S. Courts on behalf of the Judiciary in which the Commission has agreed to keep confidential the names of persons listed in all cases reported to the Commission. We construe this agreement as prohibiting the release of any identifying information with respect to the specific cases in the data in our publications or our online tools. For that reason, I am unable to identify to you any of the cases reported through the JSIN tool."

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

each of his passengers. When he was arrested, police marched him off an airliner past the same passengers he spent a career trying to protect. He was jailed under state and federal authority for 46 days. The FAA revoked all his pilot certifications and medical certificates – certificates he began earning when he was just 11 years old. He lost his livelihood at Alaska Airlines. While in-custody, his case became a media sensation and reporters camped-out at his family's home creating crippling pressure on his wife and children. Mr. Emerson has been sentenced and punished in state court. There he was convicted after pleading to all counts in the indictment and sentenced to five years of formal probation with many restrictive provisions. He has already paid all the restitution the state court ordered him to pay. These punishments will never end. Mr. Emerson has lost his livelihood. He has lost his standing in the community, the career he loved, and he will be forever marked by this federal conviction. His current trajectory is to become a substance abuse counselor to help other people. That career shift and choice is one born from his traumatic experience on board Horizon Air flight 2059.

A sentence of six months of home detention will provide no more security or rehabilitation than a sentence of probation. Mr. Emerson is constantly busy moving from home to work, to his children's schools, to community college, to treatment, and then back home. His life is one of mandated activity that fills his days and operates much like home detention. Mr. Emerson is also required to follow all his myriad conditions of probation: he must report to his Contra Costa County probation officer; he must continue to complete community service; he must stay 25-feet away from aircraft; he must also abide by the many other general conditions of probation. For this reason, a sentence of probation will operate and appear identical to a sentence of home detention.

### e. Factors Supporting Downward Departures And Variances

In addition to the factors in 18 USC 3553(a), other factors support a below guidelines sentence, including the exceptional circumstances surrounding the crime, Mr. Emerson's lack of

DEFENDANT'S SENTENCING MEMORANDUM - 20
(Case No. 3:25-cr-00306-AB)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

intent, his remarkable steps to make amends for his conduct, his efforts to deter others from making similar choices, and his exceptional cooperation in his own prosecution.

In this case, there are multiple factors that support departures both enumerated and unenumerated. Though formal consideration of departure factors is now defunct, this court may still use the facts behind them to support a sentence outside the guidelines, of probation.

### i.  Mr. Emerson's Behavior Represented a Marked Deviation from an Otherwise Law-Abiding Life – USSG 5K2.20.

Mr. Emerson has led a life of true professionalism directed toward ensuring the safety of the many thousands of passengers he transported across the world. His life was rule-bound and he performed perfectly within its constraints before this bizarre incident. If a person's criminal behavior is a marked deviation from an otherwise law-abiding life, a court may downwardly depart from the guidelines sentence. USSG 5K2.20. This departure is only warranted in exceptional cases. USSG 5K2.20(a). A departure is only warranted where defendant's conduct was 1) confined to a single occurrence, 2) it was committed without significant planning, 3) was of limited duration, 4) and represents a marked deviation from an otherwise law-abiding life. 5K2.20(b). A court may not impose this departure if the offense 1) involved serious bodily injury or death, 2) the defendant discharged a firearm or otherwise used a firearm as a dangerous weapon, 3) the offense is a serious drug trafficking offense, 4) and the defendant has a criminal history outside the instant offense. 5K2.20(c).

This case satisfies all the above requirements. Mr. Emerson committed this act without any planning in a single incident of limited duration. His conduct represented a drastic deviation from his law-abiding life and Mr. Emerson has no criminal history. As such this Court should consider Mr. Emerson's conduct an extraordinary deviation from an otherwise law-abiding life and impose a lesser sentence than his guidelines calculation.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

ii.    **Mr. Emerson Cooperated With His Prosecution To an Unusual Degree – Unenumerated.**

Mr. Emerson completely and fully cooperated with his prosecution beginning when he voluntarily left the cockpit, asked the flight attendant to hand cuff him and ending with his pleas to all counts in both cases. Between these two events, Mr. Emerson gave full interviews with federal and state authorities, allowed a search of his phone, and testified at grand jury. Mr. Emerson's cooperation was comprehensive and complete. As such, this Court should consider these facts and impose a lesser sentence than his guidelines calculation.

iii.    **Mr. Emerson Has Taken Exceptional Efforts to Prevent Similar Incidents from Happening to Other Pilots – Unenumerated.**

Mr. Emerson asks this Court to impose a departure or variance because of the Herculean efforts he has taken to prevent any similar conduct from occurring. Through public interviews about his personal experience with psilocybin, through his founding of Clear Skies Ahead and its advocacy for pilot health, through his many speaking appointments about substance abuse and aviation, Mr. Emerson has taken huge positive steps to reduce the chance that anything like this ever happens again. His efforts have had a real impact on the aviation community. It led to a New York Times documentary where he authentically accounted for his experience.[8] It led to a YouTube documentary by another professional pilot about his experience.[9] Mr. Emerson and his wife Sarah have spoken on Good Morning America,[10] and other news programs communicating his experience as a pilot dealing with melancholy and the disincentives to seek mental health treatment, his reliance on alcohol, and his eventual use of psilocybin. In public and private, Mr. Emerson has correctly connected his use of psilocybin to his abuse of alcohol. His efforts have raised awareness with the NTSB, the FAA and with Congress. Mr. Emerson's experience and

---

[8] https://www.fxnetworks.com/shows/new-york-times-presents
[9] https://www.youtube.com/watch?v=988j2-4CdgM
[10] https://www.goodmorningamerica.com/news/story/former-alaska-airlines-pilot-shut-engines-flight-shares-113066835

DEFENDANT'S SENTENCING MEMORANDUM - 22
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

advocacy contributed to the recent passage of the Pilot Mental Health Act, a landmark piece of legislation. Mr. Emerson's exceptional and remarkable advocacy has helped change the culture of aviation. As such, this Court should impose a probationary sentence.

### iv.    Mr. Emerson Has Taken  Exceptional Efforts To Solve His Underlying Substance Dependence Issue – Unenumerated.

Mr. Emerson has made exceptional efforts to address his own substance abuse issues. While in jail after his arrest, he reflected on what brought him down from a high-flying career to a jail cell in Multnomah County, charged with state and federal crimes. He began journaling. He read self-help books. He started seeing the patterns in his life that led to the incident in the cockpit of Horizon Air 2059. He linked his emotional state to his use and abuse of alcohol. He concluded he never would have used psilocybin if he had not had an alcohol use disorder. Mr. Emerson decided to abstain from alcohol. He decided to attend a substance abuse program. When he left jail in December, he went to a residential treatment program, completed that program, began intensive outpatient treatment, and engaged in the 12-step recovery community. He met his sponsor. He corresponded with other pilots in the community. He abstained from all substance use. In the last several months, Mr. Emerson began coursework to become a substance abuse evaluator and counselor, a mission he has the experience and drive to excel at.

Mr. Emerson's efforts are exceptional. He did not just attend treatment because he had to. He did it with his own initiative and through his own reasoning. He has remained dedicated to his treatment, to his education and to his advancement as a substance abuse counselor. For these exceptional efforts, this Court should impose a probationary sentence.

### v.    Mr. Emerson Has Paid Restitution in Full – Unenumerated.

As of Mr. Emerson's sentencing, he has paid every single dollar of the approximately $60,000 of restitution money out of money set aside for his family.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

vi.     **Mr. Emerson Has Already Been Significantly Punished For His Crimes -**
        **Unenumerated.**

More than other defendants faced with criminal wrongdoing, Mr. Emerson has suffered greater consequences and fallen much farther. His fall from high-paid, esteemed professional to pariah is jarring. Beginning when Mr. Emerson was in high school, he mowed lawns to pay for flight lessons, he attended an aviation-centered University (University of North Dakota) and overcame countless barriers, including furloughs and low-paying jobs with other smaller companies. From finally achieving his dream of being a Captain at a major airline to a person publicly stripped of all his ratings, certificates, and title has been an exceptional descent and consequence. Mr. Emerson's 46 days in jail was impactful, cathartic, and punishing. He will never be able to expunge this conviction. Mr. Emerson is left to rebuild his life, the financial life of his family, choose a new career, and be the best father he can be. This fall from grace will take all of Mr. Emerson's and his family's energy to rebuild. Mr. Emerson's efforts to make amends, to contend with a substance use disorder, and to rebuild his life began with Mr. Emerson's release from jail in December of 2023. His efforts, and the barriers to rebuilding his life have not ceased. Even though almost two years have passed since this event, Mr. Emerson has only found unstable, part-time employment as a pool cleaner and pressure washer. His job applications have been rejected time and again because of his notoriety and because of these pending charges. Undeterred, Mr. Emerson re-enrolled in school to become a substance abuse evaluator and counselor. A further jail sentence will interfere with Mr. Emerson's exceptional efforts to grow and recover from this crime. For this reason, this Court should find that the punishment Mr. Emerson has already suffered is sufficient and impose a variance to probation.

vii.    **Mr. Emerson's Role as a Stay-At-Home Father Is Indispensable to**
        **Keeping his Family Functioning – 5K2(a)(4).**

In important ways, Mr. Emerson's life has changed for the better. He has two children, who are in the 5th and 3rd grades respectively. Because Mr. Emerson is now sober and has a job that

DEFENDANT'S SENTENCING MEMORANDUM - 24
(Case No. 3:25-cr-00306-AB)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

keeps him close to home, he has become the children's primary caregiver. He has embraced that role while his wife, Sarah, teaches at a local community college and earns much of the money the family is now needs to survive. Mr. Emerson is a vital component to ensuring that Sarah can work and that their children have a parent available if they need a parent. A prison sentence will create massive family instability and uncertainty for Sarah and the children. Because Mr. Emerson is exceptionally important to parenting his children, this Court should impose a probationary sentence.

### 3.  Conclusion

This case represents an extreme and bizarre aberration in Mr. Emerson's life and one he could never have foreseen. For this conduct, Mr. Emerson faces a federal sentencing despite being sentenced and punished for the same conduct in state court. He has cooperated with both his state and federal prosecutions and has taken full responsibility for his conduct and pled to every single offense with which he is charged. Mr. Emerson made authentic and fulsome amends for his conduct and flawlessly complied with rigors of both state and federal pretrial restrictions. He has expressed his contrition for his choice to use psilocybin and has paid his restitution in full. Mr. Emerson has also done his best to deter others from engaging in the same conduct by publicly discussing his experience with high profile media organizations, by talking to pilot groups, and by starting his own non-profit organization geared to helping pilots to seek care. Mr. Emerson has also taken active and real steps to combat the causal factors of this incident. He has abstained from alcohol, completed an in-patient substance abuse program and is in school to be a substance abuse evaluator.  Each of these factors, combined with Mr. Emerson's indispensable role as a stay-at-home father are substantial reasons for this Court to impose a downward departure to probation. However, if any single reason cited above is not reason by itself to impose a downward departure, taken together, these factors create a mosaic that depicts an exceptional person deserving of a

**Levi Merrithew Horst PC**
610 SW Alder St. Suite 415
Portland, OR 97205
T: 971.229.1241 | F: 971.544.7092

probationary sentence. On these bases, Mr. Emerson respectfully requests that this Court impose a sentence of probation.

    **DATED** this 12th day of November, 2025.

By: s/ Ethan Levi
**Ethan Levi**, OSB No. 994255
**Of Attorneys for Defendant**

DEFENDANT'S SENTENCING MEMORANDUM - 26
(Case No. 3:25-cr-00306-AB)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092